## James Turner v. The State.

### No. 2154. Decided December 13, 1899.

**1. Murder—Indictment—Former Acquittal of Murder—Trial for Manslaughter.**

The rule of practice in this State is that a former acquittal of murder will not bar a subsequent prosecution under the same indictment for manslaughter.

**2. Same—Evidence—Malice—Res Gestae.**

Upon a trial for manslaughter, where there had been a former acquittal of murder, evidence which is part of the res gestae of the transaction is admissible, even though it tends to prove malice.

**3. Manslaughter—Former Acquittal of Murder—Charge.**

On a subsequent trial for manslaughter, where there had been a previous acquittal in the same case of murder, and the evidence on the manslaughter trial reasonably shows that defendant is guilty of murder of either the first or second degree, and not guilty of manslaughter, it is the duty of the court, especially where so requested by defendant, to instruct the jury that if they should believe the evidence established the guilt of defendant of either murder of the first or second degree, to acquit him altogether.

**4. Manslaughter—Evidence Establishing.**

See opinion of the court for facts in evidence summarized which are held to establish manslaughter and not murder, and which support a conviction of manslaughter.

Appeal from the District Court of Burnett. Tried below before Hon. John M. Furman.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Charles W. Jennings, by cutting him with a knife, on the 12th day of March, 1899.

This is the third appeal. The two former appeals have not been reported in our reports, but may be found in 46 Southwestern Reporter, 830, and 51 Southwestern Reporter, 366.

The evidence, as the same is set out in the opinion in 46 Southwestern Reporter, 830, is here reproduced as follows:

The homicide occurred on the evening of March 12th, in the little town of Bertram, in Burnet County. Appellant was a young man, and lived in that vicinity; and deceased also resided in that community, and had a daughter, Miss Carrie Jennings, who was at the time 19 years of age. Appellant some time previous to the homicide had been paying attention to her. Her father disliked this, and had forbidden her to associate with the defendant, as she states in her testimony, "because he was worthless and no 'count," and had forbidden appellant coming to his house. A day or two prior to the homicide, appellant wrote Miss Carrie a letter, and sent it to her by Miss Ollie Blacklock, requesting her to meet him at the home of the latter, and go with a party to a concert at Concord, some ten or twelve miles distant from Bertram. This she agreed to do. In pursuance of this agreement she met appellant at the residence of Bud

Ater, instead of Blacklock, about 1 or 2 o'clock on the evening of the 11th, in order to go to Concord. Appellant came to the place in a buggy, and he and Miss Carrie from there proceeded to Concord, to the concert. In the party was Miss Ollie Blacklock and her attendant, besides several others, who went in buggies. The parties stopped at Mr. Allen's, in the vicinity of Concord, and took supper, and went from there to the concert, which closed about 11 or 12 o'clock. After its close they returned home that night in their buggies, arriving about 3 or 4 o'clock. By some means the deceased received information of his daughter accompanying defendant to said concert on the night of the 11th. On the evening of the 12th, about 3 or 4 o'clock, he came into town and met the defendant, and the difficulty ensued which resulted in the homicide. The evidence shows that he first met deceased in the rear, or south, of the store of one Reed. The store fronts north, and is about sixty feet long; the east side being on a street. Appellant at the time was with the witness Driskill, and one or two other parties, and deceased suggested to him "that he wanted to see him a minute." The witness Driskill states that, as they walked off together, he heard deceased say to defendant, "You know I don't want you to come on my premises." Defendant replied, "I have not yet been on your premises." This is all said witness heard at this time. The defendant and deceased passed around the southeast corner of said store, and went up the street, to about the middle of the building. Other witnesses testify as to what occurred there. C. L. Louck, who is perhaps the strongest witness for the State, testified as to what occurred here, substantially as follows: That he (witness) and Arthur Cotton and Bud Ater were near the southeast end of said building, a little out in the street, talking; that deceased and defendant were talking together about halfway up the east wall of Reed's store, out in the street, about nine feet from the wall. Defendant was next to the wall. They were standing four or five feet apart. That he could not hear what passed between them. They conversed in a low tone. After conversing a few minutes they advanced towards where witness and the other parties were standing,—deceased a little in advance of appellant. They came within a few feet of witness. The first he heard was a remark from the deceased, the substance of which was that he was defendant's equal. If defendant made any reply, witness did not catch it. Deceased then remarked that he would want nothing but his naked fist to knock it out of him. Defendant squared himself back, and said, "You can't do it." Deceased then said, "You are a damn liar." Defendant then said, "Mr. Jennings, you ought not to call me a liar. You are a better man than I am physically, but otherwise you are not." Deceased replied, "You haven't a bit of principle." Defendant said, "You haven't no principle, and are no part of a gentleman." Deceased then called the defendant a liar. Defendant replied, "You are another;" and deceased then struck or slapped defendant on the

side of the head,—apparently a slight blow. Defendant then rushed at deceased, and cut at him with a knife. He put his left arm partially around the deceased's right arm, and cut at him with his right hand. Deceased then backed a little, and appeared to stumble and bend over a little forward. Defendant then reached over and cut deceased on the left side of the back. Deceased then straightened up, and defendant struck him with his knife again. Witness then rushed at them to separate them, but they wheeled off so that he only touched one of them. They were then clinched. Witness did not see deceased strike defendant after his first blow. Deceased and defendant then circled around, and came near the window; defendant backing toward the window. About four feet from the window they were still clinched; deceased with his left arm still around defendant's shoulder, holding him. He reached down with his right hand, and picked up a rock or chunk, and raised it up, and appeared to strike or drop the rock on defendant's left shoulder. It glanced defendant's head,—fell on his shoulder. The rock was about the size of my double fist. Deceased struck or dropped the rock on the defendant's shoulder before he became erect. When deceased became erect, they again clinched; and defendant cut deceased in his neck, holding the knife in the wound a moment, until I could pull him off. Deceased started off in the street, and defendant started back towards deceased, and witness stepped ahead of him; and then defendant turned, and went and picked up his hat, and started to leave. Some one said to him, "You have killed that man," and defendant replied, "What do I care if I have killed him?" Deceased in the meantime walked around the southeast corner of the store, near the cistern, and sank down, and expired in a short time thereafter. None of the other witnesses state the facts as strongly against the appellant as does this witness. We gather from their testimony, however, that deceased was the aggressor in the beginning of the difficulty; that he abused appellant for going with his daughter against his consent. Appellant did not seem disposed at first to resent the abuse of deceased, but ultimately returned insult for insult. Deceased finally called appellant a "damn liar," appellant called him another, and then deceased struck him,—some of the witnesses say a slight blow, and the others, a hard blow. Whether it was with his open hand or fist is not rendered certain. Appellant himself testified that it was a heavy blow he struck him. As soon as appellant was struck, he clinched with deceased, and they began fighting; appellant cutting him first in the back. We believe all the witnesses except Louck concur in stating that, after deceased and defendant had clinched awhile, deceased had been cut several times in the back and in the breast, none of which wounds were fatal; that deceased shoved him off from him, and the parties were separated for an instant. Deceased immediately started towards the wall, and picked up a rock. As he was picking up this rock, and about the time he got it ready

to strike, appellant rushed at him again, and inflicted upon him the fatal stab in the neck, cutting his jugular vein. Some of the witnesses say that deceased struck appellant on the head or shoulder with the rock at or about the time appellant rushed at him with the knife the second time; but others say that the rock appeared to fall from the hands of deceased, and on appellant, without his making any lick with it. The evidence shows, without any controversy, that appellant had his knife in his hand, whittling, at the time deceased first approached, and kept the knife in his hand until the difficulty ensued. 'The knife used was a common pocketknife. The State proved that some one mentioned to appellant, a short time before the difficulty, that deceased was in town, and he was liable to get after him about going to the concert with his daughter; that appellant replied that deceased was a better man than he was, and that all he had was his knife, which he then appeared to have in his hand. The State also showed expressions of appellant prior to the homicide suggestive of ·malice. Rufus Lewis testified that on one occasion, about the 6th of March, defendant said Carrie Jennings had told him that deceased had forbidden him to keep company with her, and that defendant had sent word to deceased, by Carrie, that he was not afraid of him, and would shoot it out with him, or cut it out or rock it out with him. 'That defendant also told him that Carrie had informed him that her father had said that he intended to whip defendant if he ever caught him on his premises. This conversation, however, was denied by defendant. The State also proved some expressions made immediately after the homicide by appellant, suggestive of malice on his part. During the fight, appellant received a cut on the back of his left hand, an inch or so long, evidently inflicted by himself in cutting deceased. Appellant states the difficulty to have occurred as follows: That he was standing in the rear of Reed's saloon, with Ed Blacklock and Walter Stewart. That at the time he had his knife in his hand, whittling. Deceased came along, and said that he desired to talk with him. That they went together around the southeast corner of Reed's store, and stopped about thirty feet from the southeast corner, out in the street. Deceased said to him, "You know I do not allow you to go on my place," to which he replied that he had not been on his place. Deceased then called him a "God damn liar," to which he replied, "You ought not to call me that." Deceased then told him he was a "God damn dog," to which he replied, "You ought not to call me that." Deceased then said, "You know that I do not permit Carrie to go buggy riding with a young man," to which he replied that he never knew that he objected to her going buggy riding. Deceased then said, "If ever I know of your going with her again, I will kill you." "He threatened to kill me, and abused me for a coward, and said he was fixed for me." During the time he was talking, he had his hand on his hip, and defendant believed he was armed and intended to kill him. That he said something to defendant

about writing to his daughter, and told him he would kill him if he did it again. That he promised him he would not write to her again. That he continued to abuse him, and told him he had no principle, and was no part of a gentleman. That he called him a liar, and appellant called him another, and then deceased struck him on the head a severe blow. That it dazed him, and he did not know what happened for awhile, only that they clinched. That after awhile deceased stepped back and got a rock, and struck him on the shoulder with it. That he remembered striking deceased with his knife when he struck him with the rock.

The appeal in 51 Southwestern Reporter, 366, was from a conviction of manslaughter.

When this case was again called for trial in the lower court, the defendant presented the following motion, viz: "The defendant being called to plead in said cause, says: That it appears from the record therein that he has been acquitted of all charges contained in the indictment in said cause, wherefore defendant says he ought not to be required to again plead to said indictment and moves the court that he be discharged." This motion was, on motion of the district attorney, stricken out by the trial court.

*J. G. Cook*, for appellant.—The indictment being for murder in the first degree, and the appellant having been on his first trial acquitted of that degree, and on his second trial of murder of the second degree, no further trial could be had under such indictment. Code Crim. Proc., art. 762; Murry v. State, 21 Texas Crim. App., 620; Smith v. State, 18 Texas Crim. App., 454; Tyson v. Britton, 6 Texas, 222; Roberts v. Yarboro, 41 Texas, 449; Etter v. Railway, 2 Court App. C. C., sec. 58.

The article cited reads: "If a defendant prosecuted for an offense which includes within it lesser degrees, be convicted of an offense lower than that for which he is indicted, and a new trial is granted him, the verdict upon the first trial shall be considered as an acquittal of the higher offense; but he may, upon a second trial, be convicted of the same offense of which he was before convicted, or any other inferior thereto."

It is contended that the express authority given by this article of the Code to try the defendant under the same indictment a second time, and for a different offense from that for which he was indicted, was exhausted and ceased when the appellant was tried the second time in October, 1898, for murder in the second degree, and convicted for manslaughter. If the statute authorizes a third trial, and that for an offense of a lesser degree than the one for which he was first convicted, the first conviction being for a lesser degree than that for which he was indicted, such authority must be raised by implication, and not by the language used. The language of the statute would render the indictment functus officio when the conviction in this case for man-

slaughter was set aside, and it would be no longer a basis for a criminal prosecution. The language is plain, free from ambiguity and doubt, and expresses plainly the circumstances under which a second trial may be had under the same indictment for a lesser degree than the one charged, and it is silent as to any right or authority to try a defendant the third time when he has been convicted at a second trial for an offense inferior in degree to the one for which he was first convicted. To raise such authority by implication would be in contravention to the recognized rules of construction, "that when a statute limits the thing to be done in a particular form it implies that it shall not be done otherwise" (2 Court App. C. C., sec. 58) ; and "when the Legislature has prescribed a general rule with special disabilities or privileges, these can not be enlarged or extended to objects not embraced by mere implication or parity of reason." 41 Texas, 449. Neither can the common law furnish in this case a rule of construction, for the rule there authorizes a conviction for the highest degree of homicide charged in an indictment, where a conviction has been for a lesser degree and a new trial granted. Whart. Am. Crim. Law., 4 ed., sec. 550. Which rule is in conflict with the Code of Criminal Procedure.

The second ground of error assigned in the motion for a new trial relates to the refusal of the court to instruct the jury to acquit the defendant if the testimony showed that he was guilty of murder in the first or second degrees.

A part of the testimony introduced by the State, if true, strongly tended to show the existence of malice in the defendant towards the deceased, and that the homicide was murder, and it was the imperative duty of the court, when requested by the defendant, to instruct the jury to acquit him, if they believed the homicide to be of a higher degree than manslaughter. Penal Code, arts. 701, 710; Parker v. State, 22 Texas Crim. App., 107; Fuller v. State, 30 Texas Crim. App., 562; Scroggin v. State, 32 Texas Crim. Rep., 71; Carter v. State, 40 S. W. Rep., 498; Gregory v. State, 41 S. W. Rep., 579; Leach v. State, 22 Texas Crim. App., 281; King v. State, 4 Texas Crim. App., 54; Wilson v. State, 4 Texas Crim. App., 637.

*James P. Kinnard*, District Attorney, and *Rob't A. John*, Assistant Attorney-General, for the State.—It is submitted by the State that the first contention of appellant, to the effect that the indictment had become functus officio because it charged murder upon malice aforethought, and appellant had been acquitted of both degrees of murder, and therefore said indictment would not sustain a prosecution for manslaughter, is absolutely without authority, and has not even the merit of logic to back it. For it has been uniformly held that upon the trial for murder, the indictment simply charging murder in general terms, that not only murder in the first degree might be proven and the conviction follow, but also murder in the second degree, manslaughter, both of the degrees of negligent homicide, and aggravated

and simple assault. Therefore a new trial being a trial de novo, permits, upon a trial of manslaughter only, the pleading to be sufficient upon an indictment for murder. The statement of the contention of appellant answers itself.

The second contention, to the effect that the testimony in reference to malice was not admissible, because appellant was only on trial for manslaughter, is answered by the former decision in this case. Turner v. State, 46 S. W. Rep., 830.

As stated by counsel for appellant in his oral argument to the court, and as indicated in the able brief filed by him herein, the only serious controversy is whether or not the court should have given the special charge to the jury, to the effect that if the jury found that defendant was guilty of murder either in the first or second degree, the defendant having been acquitted of murder in those degrees, they could not convict him of manslaughter, and therefore they should acquit.

If the allegation of murder in general terms embraces within it all the elements of manslaughter, then the proof of murder of necessity must embrace within it the proof of manslaughter. To hold otherwise would place the law in this anomalous condition. A man, as in the case at bar, could be charged with murder; tried and convicted of murder in the second degree; a new trial granted; tried again, and convicted of manslaughter; a new trial granted; and as in this case, if the rule be correct as invoked by appellant, if the murder be one of sudden passion, aroused by a cause which is inadequate, or if the issue be whether or not the cause be adequate or inadequate, then in order to convict, the State will be compelled to prove the adequacy of the cause, and the defendant would be authorized to defend by proving that the cause was inadequate; or in other words, the trial would be reduced to the absurdity of the State introducing exculpatory testimony to show guilt, and the defendant introducing incriminating facts to show innocence.

The rule insisted upon by the State is recognized by this court as between the two degrees of murder. In Baker v. State, 4 Texas Criminal Appeals, it was held that if a defendant is on trial for murder in the second degree he is not entitled to an acquittal because the evidence against him would sustain a conviction for murder in the first degree. And this doctrine has been approved in Fuller's case, cited by appellant, citing Commonwealth v. Andrews, 132 Massachusetts, 163.

Therefore, if the man be charged with murder in the second degree, and tried for murder in the second degree, if the proof shows that it was committed upon express malice, he is not entitled to a charge like the one requested by appellant. True, this doctrine has been questioned in the Conde case, 35 Texas Criminal Reports, 98; but the opinion of the majority of the court in that case sustained the proposition laid down in the Fuller case, supra.

Now, then, if the distinctions between murder in the first and second degrees are as well defined and as distinct as the distinction between

murder in the second degree and manslaughter, the State insists that either the Fuller case is wrong, and the cases upon which the Fuller case is based, and Judge Henderson's opinion in the Conde case is correct. The common law authorities sustain the State in this position.

The State submits as a proposition that if the appellant at bar had been indicted for manslaughter originally, then the principles to be applied would be exactly the same as where he has been acquitted of the two higher degrees of murder, and is only on trial, as in this case, for manslaughter. And yet it has been uniformly held that where a person is charged with the lower grade of an offense, such as theft of property, the value of which made it only a misdemeanor, the proof showing that the value of the property was great enough to constitute it a felony, that the defendant would not be heard to insist that he was entitled to acquittal for that reason, it being for his benefit.

On this issue Mr. Bishop, in his work on New Criminal Law, Volume 1, page 491, section 812, says: "We have some American authority contrary to the better doctrine that one can not be convicted on a charge of misdemeanor, where the evidence discloses a felony, a consequence more or less, or in some of the States deemed derivable from the statute. Such a condition of the law, wherever existing, is greatly to be deplored, for if the same evidence is not produced on the second trial, the party may altogether escape." As in this case, the second jury believing in express malice or implied malice would be forced to acquit although his guilt be undisputed. As said by Justice Hawkins, quoted by the same learned author, supra: "If the indictment is for a misdemeanor, and the added act which makes the felony appears at the trial, opinions are divided as to whether or not there can be a conviction for the misdemeanor." His decision, however, was, that there can be. And as stated by Mr. Bishop, the great weight and reason is with this contention.

Upon inspection of the American and English Encyclopedia of Law, volume 9, page 555, it is stated, as a general rule, that the only distinction between the degrees of culpable homicide is merely as affecting the gradation of punishment, or to quote it literally: "As these degrees of murder are usually defined, neither of them differ from the common law murder, but courts have repeatedly said that the apparent object of this statutory discrimination is merely a gradation of the punishment according to the degree of malice and malignity." And cites to sustain this text a great many eminent authorities. This authority, on page 579, Id., in reference to manslaughter, uses the following language: "It has been held that it is no defense to an indictment for manslaughter that the evidence shows the homicide to have been committed with malice aforethought, and therefore to have been murder; but that the defendant may be convicted of manslaughter as charged in the indictment." If this is a correct rule as to manslaughter at common law, it becomes more pertinent, because our statutory manslaughter is

nearer akin and is more closely allied to murder in the first and second degree than manslaughter under the common law.

It has been held in the Bradshaw case, 50 Southwestern Reporter, 359, that upon an indictment for murder, even though the proof shows murder in the first degree, negligent homicide can be sustained. If that proposition be true, then why is not the converse of the proposition equally logical,—that if the person be charged with negligent homicide, why would not proof of murder in the first degree sustain that predicate? There is certainly no distinction in reason between the two.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at confinement in the penitentiary for a term of two years, and prosecutes this appeal. This is the third appeal in this case. 46 S. W. Rep., 830; 51 S. W. Rep., 366. The statement of facts is not materially different on this trial and on the former trial. For a report of the testimony had on the former trial, see 46 Southwestern Reporter, 830.

Appellant contends "that the prosecution could not be maintained under the indictment, inasmuch as defendant had been tried and acquitted at previous terms of this court of murder under the indictment, and that said indictment had become functus officio, and that a prosecution for manslaughter could not be maintained under said indictment." The rule and practice are otherwise in this State.

Appellant insists that the court erred in refusing to sustain his objections to the admission of certain testimony which he claims indicated malice on the part of appellant in the homicide, and which could not be introduced on a trial for manslaughter. We do not believe this contention is sound. The evidence complained of was for the most part res.gestae. All was relevant as pertaining to the transaction, and tended to show the animus or state of mind existing between the parties. Even if it be conceded that some of said testimony suggests malice, yet it would be exceedingly difficult to draw the line in a trial for homicide between the testimony that was relevant to any particular grade of unlawful homicide, so that, as a general proposition, all testimony connected with the homicide, and tending to shed light on it, either as res gestae or as indicating motive, ought to be admitted. We apprehend, however, appellant does not make any serious contention that said testimony was not admissible, but merely raises the objection to the evidence in order to reinforce himself in the assertion of his next proposition.

On the trial the court only submitted manslaughter and self-defense. Appellant prepared and presented to the court a charge to the effect that, if the jury believed the testimony introduced showed appellant was guilty of murder in either the first or second degree, to acquit him, inasmuch as he had been previously tried and acquitted for said

41st Crim. Rep.—22

offense. In that connection he cites us to Parker v. State, 22 Texas Criminal Appeals, 107; Fuller v. State, 30 Texas Criminal Appeals, 562; Carter v. State (Texas Criminal Appeals), 40 Southwestern Reporter, 498; and a number of other cases. The Parker case, supra, undoubtedly is authority for the proposition that where an accused has been convicted of manslaughter, under an indictment charging him with murder, and a new trial has been granted, on a subsequent trial of the case it would be improper for the court to instruct the jury that, if they believed the evidence showed that defendant was guilty of murder of either the first or second degree, they would be authorized to find him guilty of manslaughter. And this rule has since been followed. It would therefore seem to be sound doctrine that on a subsequent trial of an accused person for manslaughter, where he had previously been acquitted of murder of the first or second degree, and there was evidence reasonably tending to show that he was guilty of murder of either the first or second degree, and not guilty of manslaughter, it would be the duty of the court, especially when requested, to instruct the jury that, if they believed the evidence established the guilt of appellant of either murder of the first or second degree to acquit him altogether. We note in this connection that the Assistant Attorney-General makes a strong argument in opposition to this rule, contending that inasmuch as the Fuller case, supra, holds that the rule does not apply where a party has been convicted of murder in the second degree, because malice, as stated in that opinion, applies to both degrees of murder, the same doctrine should apply where the accused has been convicted of manslaughter; arguing, as he does, and citing authority to the effect, that malice is also an essential ingredient of manslaughter. We are inclined to agree with the Assistant Attorney-General that malice does pertain to a charge of manslaughter, but not malice aforethought, for this is confined solely to murder. But however the rule laid down in Parker's case came about, it has been followed for a long time, and we are not inclined to overturn it. Conde v. State, 35 Texas Crim. Rep., 98.

The only question then for our consideration is, was the testimony of such a character as to require the requested charge? We have examined the record carefully in this regard,—especially those portions which have been called to our attention by appellant's counsel in his able brief. Such expressions as appear to have been made by defendant before the homicide with reference to the deceased do not seem to indicate any malicious design; that is, malitia præcogitata, which characterizes murder. For instance, appellant is shown to have stated on one occasion, prior to the homicide, that deceased objected to his going to his house to see his daughter, and that he did not want to go there and raise a racket. And again, on the day of the homicide, he is shown to have stated that he guessed that, if deceased found out that he had been to an entertainment with his girl, he would stamp it out of him; that deceased was a better man physically than he was, and all that he

had to defend himself with was his pocketknife. These expressions, to our minds do not indicate an aggressive mood on the part of appellant, but rather a spirit of forbearance on his part; that he had some apprehension that an attack might be made on him for his attentions to deceased's daughter; that he would endeavor to avoid same, but, if attacked, he would have to defend himself. The record also discloses some expressions of appellant made immediately after the homicide. For instance, his remark to Corbin, as he was being carried away from the scene of the difficulty, to the effect that he had killed Jennings, that he had cut his damned heart out; and also his expression to Dr. Elder, about the same time, when the doctor, after examining his cut hand, asked "if all his hollooing was about the little cut on his hand," to which defendant replied, "You just ought to see the other fellow." These expressions under some circumstances might suggest malice, but when it is remembered that the fight was just over; that appellant had been engaged in a serious struggle, in which he received several severe hurts and bruises,—in the light of the surrounding circumstances these expressions would indicate that they did not issue from a calm and deliberate mind, but from one greatly excited by passion. More especially is this true when viewed in the light of defendant's own testimony (and the jury were bound to regard the matter from defendant's standpoint). This shows that deceased was the aggresor in the difficulty; that he first approached appellant, who was attending to his own business, took him from the company where he was engaged in conversation, and at once began to vilify and abuse him; stating to him, among other things, that he had whipped his daughter that morning for going with him (appellant) the night before. His language, from all the witnesses who heard the conversation, was exceedingly denunciatory. He told appellant that he was no gentleman, and had no principle; that he was a coward and liar; and, when appellant retorted that he was another, he then struck him in the face a severe blow, which dazed him. Appellant had his knife in his hand at the time whittling, and, as they clinched, began cutting deceased. During the progress of the difficulty, and before the fatal blow was struck, the parties appear to have separated for a short interval, when deceased got a rock, and either struck, or was about to strike appellant. At this juncture he rushed upon him, and with the knife inflicted the mortal wound. In this connection it must be remembered, all the time, that appellant had reason to believe that deceased was armed and prepared for the conflict. Under these circumstances, it occurs to us that the only real issue in the case was manslaughter or self-defense. In the light of the facts, we fail to see how any honest jury could have rightly found appellant was not at the time of the difficulty excited by passion, for all the evidence tends to show this. And, moreover, it is difficult for us to understand how a jury could say that adequate cause did not exist. Deceased struck him the first blow, and appellant, who, of all the witnesses alone could know, states that

the blow was a hard one and dazed and hurt him. This the law itself makes adequate cause; and, in addition, this blow causing pain was re-inforced by other circumstances of a very aggravated character. The fact that immediately preceding the blow deceased informed appellant that he had whipped his daughter that morning for going with him, in itself, would excite passion in any honorable person, especially when that person was suitor of the deceased's daughter. Reviewing the entire record in this case, it occurs to us that the testimony relied on by counsel as a predicate for the requested charge does not tend to show that malitia præcogitata characterizing the offense of murder. On the contrary, under the evidence, appellant could only be convicted of manslaughter. The jury found him guilty of this offense, and as-sessed against him the lowest penalty, and we can see no reason to disturb their verdict. The judgment is affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge, absent.

BROOKS, JUDGE.—I merely concur in the disposition of the case.